# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 96-KA-01113-COA

**GREGORY MORRIS**                                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

DATE OF JUDGMENT:              09/06/96

TRIAL JUDGE:                   HON. JOHN M. MONTGOMERY

COURT FROM WHICH APPEALED: LOWNDES COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:        RICHARD BURDINE

ATTORNEYS FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL

                                       BY:  WAYNE SNUGGS

DISTRICT ATTORNEY:             FORREST ALLGOOD

NATURE OF THE CASE:            CRIMINAL - FELONY

TRIAL COURT DISPOSITION:       COUNTS 1 & 2 ATTEMPTED MURDER: CT I SENTENCED TO SERVE A TERM OF 6 YRS IN THE MDOC; CT II SENTENCED TO SERVE A TERM OF 6 YRS IN THE MDOC SAID SENTENCE IN CT I & CT II TO RUN CONSECUTIVELY

DISPOSITION:                   AFFIRMED - 05/18/1999

MOTION FOR REHEARING FILED:

CERTIORARI FILED:

MANDATE ISSUED:                6/8/99

EN BANC.

THOMAS, J., FOR THE COURT:

¶1. Pursuant to a two-count indictment for the attempted murders of Ivory Morris and Janice Morris, who are the father and mother of the appellant, Gregory Morris, a jury returned a verdict of "Guilty as charged" on both counts in the Circuit Court of Lowndes County. That Court entered its order which adjudicated Morris's conviction of both counts of attempted murder and sentenced him "to serve a term of six (6) years in Count one (1) and six (6) years in Count two (2) in the Mississippi Department of Corrections, said sentences . . . to run consecutively." Morris filed a motion for new trial or in the alternative JNOV, which the trial court denied. Morris appeals to present but one issue, which we quote from his brief:

**WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?**

¶2. Finding no error, we affirm.

# FACTS

¶3. The appellant, Gregory Morris, was born in Flint, Michigan on July 24, 1969, to the marriage of Ivory Morris and Mrs. Janice Morris. His father, Ivory Morris, was an employee of the Chevrolet Division of General Motors Corporation in Flint. The relationship between Morris and his parents deteriorated as Morris struggled toward maturity. For example, Morris once threw a concrete block through a window in his parents' home in Flint one night. On another occasion, Morris burned a Corvette automobile which his father Ivory Morris had purchased, brought home, and left on a trailer parked in the back of his house in Flint.

¶4. In August 1993, Ivory Morris retired from his employment with the Chevrolet Division of General Motors, and he and his wife, Janice Morris, moved to Columbus, Mississippi, where they established their residence to enjoy Mr. Morris's retirement. The Morrises did not tell their son Gregory where they had moved. Nevertheless, two years later, the Morrises received a letter from their son in an envelope postmarked August 9, 1995, addressed to their correct street address in Columbus. In it, Gregory Morris wrote, *inter alia*:

> Dear Ivory & Jan
>
> I start a new job this week paying $1.64 more than the one I quit[.] . . . I still put in 60 hours a week and go to the gym. You see[,] my hate has grown so much stronger[,] it has made me more stronger [sic]. I remember Ivory looking me in my face saying[, "Stay sick. I don't owe you . . . . I' ve got to see your faces one last time as nasty as you were to me. I'm coming to thank you for my life. I'm coming to show you how when someone just wants to hurt you and mess you up for life[,] how it feels . . . . [O]ne thing you can bet your last breath on[,] and that is the most sincere thing you ever heard in your life. . . . I will see you again and make you wish you weren't so nasty to me[.] I'm gonna [sic] make my life count for something by destroying you like [sic] you done [sic] me.
>
> I'm gonna [sic] look you in your face and say[, "]No mercy." My hate has made me so strong. Strong enough to get up and work full time, over time, not smoke or drink beers. Because I will see my nasty parents again. Smiling while they watching [sic] me die. I'm gonna [sic] smile this time!! Nothing to live for but to see you again[.] I will!

¶5. Almost two months later during the evening of December 2, 1995, Karen Morris, sister of Gregory Morris, who lived in Flint, Michigan, called her parents, Ivory and Jan Morris, to tell them that she had reason to believe that her brother Gregory had come to Columbus to harm them. Two days later, on Monday, December 4, 1995, Ivory Morris found a note in his mailbox. It read, "SEE YA SOON NASTY BITCHES." Because of their concern for their safety, the Morrises drove to the Lowndes County Sheriff's Department, where they talked to Deputy Sheriff Joe Young, who served in the criminal investigation division of that department. The Morrises told Deputy Young that they feared that their son Gregory would try to kill them, and Deputy Young asked the Morrises to provide him a description and a "tag number" if the Morrises could. Ivory and Jan Morris had not seen their son Gregory when they talked to Deputy Young.

¶6. The Morrises returned to their home, where they next prepared to go to the bank. As they were leaving their home, the Morrises observed Gregory as he drove by in the beige Escort automobile which they had helped him buy before Mr. Morris had retired in August 1993. As they drove away from their home, the Morrises were behind their son's automobile. When Gregory Morris stopped at a convenience store, his parents also stopped there to talk with their son. Morris told his father and mother that he had come "down here to finish the job that he started in Michigan." Gregory added that he was going to kill them. Jan Morris recorded the license plate number of her son's Escort while they were at the convenience store.

¶7. The Morrises left the convenience store and were traveling to the sheriff's department to give the deputies the license plate number when Ivory Morris saw Frank Boyd inside another convenience store. Mr. Morris had known Frank Boyd when both of them had worked for General Motors in Flint. After Ivory Morris stopped his car at this second convenience store, Gregory Morris, who had been driving his car ahead of his parents' car, turned his car around and returned to the second convenience store. There, Gregory Morris stopped his car beside his parents' car, and from inside his car, Gregory told the Morrises that he had purchased a weapon and that if they, his parents, would follow him to the pawn shop, he would get the weapon and "would finish the job right there." Ivory Morris told his son "to just go ahead on" because they were going to the sheriff's department to give the license plate number to the deputies there. Perhaps because Frank Boyd had only one leg, he had not come outside the second convenience store in time to hear the exchange between Morris and his parents.

¶8. After Ivory and Jan Morris went to the sheriff's department, they then went to their original destination, the bank, where again they encountered their son. When his father told Gregory Morris that they had given the sheriff's department the license plate number of Gregory's Escort, Morris replied that "he didn't care because they had already stopped him, and wasn't nothing that they could do to him." After the Morrises left the bank to return to their home, they saw Gregory Morris drive to a pizza place, where he stopped his Escort. After Gregory stopped, Ivory Morris saw him turn around in the driver's seat and "reach[] over into the back seat of his car." This time, Ivory Morris did not stop because, as he testified that he told his wife, "[h]e must have his weapon then because . . . he [was] reaching over in the back seat for something." Instead, the Morrises continued to their home, where they remained the rest of that day and night.

¶9. The next morning, Tuesday, December 5, shortly after Deputy Sheriff Young reported for work, he received a telephone call from Officer Terry Clemmons with the Genesee Township Police Department in Genesee, Michigan. Officer Clemmons advised Deputy Young that he "should take this case real serious [sic]." Deputy Young then called Ivory Morris, who related to him the events involving his son the previous day, December 4. Next, Deputy Young began "calling pawn shops in town to see if possibly Gregory had purchased a gun at any of the pawn shops." He learned that Gregory Morris "had purchased a Mac 90 assault rifle at the City Pawn and Gun Shop on the fourth of December." Armed with this alarming information, Deputy Young again called Ivory Morris and arranged for a deputy sheriff to go to the Morrises' home and then "escort them to the justice court building so that [the Morrises] could sign an affidavit against Mr. Morris."

¶10. Deputy Young met the Morrises at the justice court building, where one or the other of the Morrises executed an affidavit which charged Gregory Morris with the crime of stalking. The justice court judge then issued two warrants for the arrest of Gregory Morris on the charges of stalking his parents. Deputy Young "contacted 911 [and] had them to put out a be-on-the-lookout for Gregory Morris and the vehicle that he was driving." A deputy returned the Morrises to their home and "gave [them] five minutes to get [their]

belongings together and to go to Aberdeen to stay in a hotel." Later that same day, December 5, Ivory Morris called his friend, Frank Boyd, who told him that "it was okay to come home."

¶11. Earlier that day, shortly after twelve o'clock noon, Columbus police officers located Gregory Morris's car parked in the parking lot at a motel in Columbus. Because the officers knew that Morris had bought an assault rifle, the Columbus Police Department SWAT Team entered and secured Morris's motel room after another Lowndes County deputy sheriff, Tony Mulligan, had verified with the motel's desk clerk that Morris occupied the room. Deputy Mulligan called Morris's room, and when Morris answered the telephone, Mulligan signaled the members of the SWAT team, who then entered the room, secured it, and arrested Morris. The officers found the Mac assault rifle, which was unloaded, in a closet in the bathroom. They also found three clips loaded with ammunition and the box in which the ammunition had been purchased in the motel room.

¶12. As Deputy Sheriff Young was driving Morris to the Lowndes County Sheriff's Department, Morris told him "that his parents had done a lot of nasty things to him in his life [that Young] would never be able to understand." Morris denied to Deputy Young that he planned to kill his parents and explained that he had bought the gun "[f]or protection." David James, an employee of the City Pawn and Gun Shop, had sold the Norinco Mac 90 assault rifle, which came with the additional clips, to Morris on Monday, December 4. However, James did not recall whether he had sold Morris any ammunition for the assault rifle.

## TRIAL

¶13. In both counts of the indictment which it returned against Morris, the grand jury charged that "in furtherance [of the attempt to kill and murder, Morris] did the following overt acts: 1) by sending [his parent] a threatening letter; 2) by telling the said [parent] that he was going to get a gun and kill [the parent]; and 3) by obtaining a firearm; but was intercepted and failed therein . . . ." We forego a review of the testimony and evidence of Morris's guilt because our recitation of the facts reflects the evidence in the light most favorable to the jury's verdict of Gregory Morris's guilt of the attempted murders of his father, Ivory Morris, and of his mother, Janice Morris.

¶14. After the State rested, Morris moved "to direct a verdict of acquittal on [his] behalf" because "[t]he facts would not substantiate the law and that this is a question that should not go to the jury." After he heard further argument by both the State and Morris's counsel, the judge denied the motion for directed verdict. We quote from the record the judge's explanation for his denial of the motion:

> This court is required to consider the evidence in light most favorable to the State, giving the State the benefit of all favorable inferences that may be reasonably drawn from the evidence and unless the evidence is so lacking that no reasonable jury could find the plaintiff or the defendant guilty, the motion must be denied. . . . The defendant is charged with the attempt to commit the crime of murder. A direct overt act done towards its commission and the failure to consummate the commission . . . constitute the crime of attempt. The court finds that the undisputed testimony . . . is that there was a [threatening] letter sent. The victims testified that they had been threatened, that the defendant would get a gun and kill them. This was corroborated by other family members. Defendant actually obtained a firearm and the defendant came from the State of Michigan to Columbus, Mississippi, the . . . residence of the . . . alleged victims. But due to the police work, the . . . defendant was arrested and failed in the commission of this crime as alleged by the State. The court is of the opinion the State has made a prima facie case and that this matter should be submitted to the jury upon

proper instructions for their determination.

¶15. This Court finds noteworthy the following instructions of law which Morris requested and the judge granted:

INSTRUCTION NO. D 2

To constitute an attempt, there must be an act directed to the commission of an intended crime which goes beyond mere preparation and is apparently suited for its intended purpose.

If you find that the State has failed to prove beyond a reasonable doubt that Greg Morris committed an overt act beyond mere preparation, then you shall find him not guilty of attempted murder on both counts.

INSTRUCTION NO. D 3A

An attempt is a direct movement toward the commission of a crime after the preparations have been made; that the Defendant's act must be a direct, unequivocal act towards the commission of the intended crime; that his acts must have progressed to the extent of giving him power to commit the offense and nothing more but an interruption prevented the commission of the offense; that the defendant's act must reach far enough toward the accomplishment of his intention to commit the offense to amount to the commencement of the consummation or to be a step in the direct movement toward its commission; and that some appreciable fragment of the crime must be committed so that the crime would be completed if the defendant were not interrupted.

If you find that the State has failed to prove beyond a reasonable doubt that Defendant's actions were a direct movement towards the commission of a crime, then you shall find Greg Morris not guilty of attempted murder on both counts.

¶16. The State did not object to the judge's granting either of these instructions which Morris requested; neither does the State on appeal question their correctness insofar as they express the law of what constitutes the commission of an attempt to commit a felony, murder included. This Court finds Instructions Nos. D-1 and D-2 to be correct statements of the law on what constitutes an overt attempt to commit a crime as Section 97-1-7 of the Mississippi Code defines the "general attempt" to commit a crime.[1] We have stated the result of the trial.

## ANALYSIS

¶17. Although the appellant's one issue appears to attack only the weight of the evidence, our review of his one issue necessarily includes our evaluation of the sufficiency of the evidence. *See Walters v. State*, 720 So. 2d 856, 866 (Miss. 1998) (opining that the appellant's assignment of error that the jury's verdict was against the overwhelming weight of the evidence "challenge[d] the weight and sufficiency of the evidence." Of course, the issues of the sufficiency and of the weight of the evidence are different, and thus the standards of review for resolving these separate issues are different. Because Morris presented both issues in his "Motion for New Trial or Judgment of Acquittal" and because his brief suggests both issues, we will address both issues.

**A. Sufficiency of the evidence**

## 1. Standard of Review

¶18. In resolving the issue of whether the evidence is sufficient to support the jury's verdict that the appellant is guilty of the crime for which he has been indicted, this Court can reverse only "where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987). Furthermore, we must accept all credible evidence presented at trial as true and consider all such evidence in the light most favorable to the verdict. *Id*. "When the sufficiency of the evidence is challenged on appeal, this Court properly should review the [trial court's] ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id*. at 808 n.3; *see also Ballenger v. State*, 667 So. 2d 1242, 1252 (Miss. 1995); *Smith v. State*, 646 So. 2d 538, 543 (Miss. 1994). Gregory Morris challenged the sufficiency of the evidence when he moved for a directed verdict after the State rested, and he renewed the motion when the defense rested. His last challenge as to the sufficiency of the evidence exists in his "Motion for New Trial or Judgment of Acquittal," wherein he stated, "The verdict is against the great weight and sufficiency of the evidence."

## 2. The first and third elements of Morris's attempt to murder his parents

¶19. The three elements of an attempted crime include "(1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission." *Edwards v. State*, 500 So. 2d 967, 969 (Miss. 1986). *See also Bucklew v. State*, 206 So. 2d 200, 202 (Miss. 1968); *Pruitt v. State*, 528 So. 2d 828, 830 (Miss. 1988); *McGowan v. State*, 541 So. 2d 1027, 1030 (Miss. 1989); *Ross v. State*, 601 So. 2d 872, 874 (Miss. 1992); *Henderson v. State*, 660 So. 2d 220, 222 (Miss. 1995).

¶20. The first and third elements of the crimes of the attempted murders of his father and mother for which Morris was indicted pose no difficulty with regard to the sufficiency of the evidence. This Court first considers the third element of Morris's attempt to murder his parents, *i. e.*, the failure to consummate the commission of the murder of Ivory and Jan Morris. The third element is satisfied by the apprehension and arrest of Gregory Morris and the initial hiding and thereafter appearance of both Ivory and Jan Morris at the beginning of the trial to testify on behalf of the State. With regard to the first element, that of intent, we note that intent is "rarely susceptible of direct proof," but it may be inferred from the facts, circumstances, and conduct of the party. *Thames v. State*, 221 Miss. 573, 577, 73 So. 2d 134, 136 (1954); *see also McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993). Frequently, examining what is evinced by the defendant's conduct is the only means of determining a defendant's state of mind. *Minter v. State*, 583 So. 2d 973, 974 (Miss. 1991). However, in the present case, the State's witnesses, Ivory Morris, Jan Morris, and Karen Morris, their daughter, testified that Gregory Morris threatened to kill his parents several times. The Morrises' testimony relating their several encounters with their son on Monday, December 4, 1995, established that their son Gregory Morris threatened to kill them. For example, both Ivory Morris and Jan Morris testified that when they stopped at the second convenience store to tell Frank Boyd about their son's coming to Columbus, Gregory drove up to their car, stopped, and told them, to quote Jan Morris's testimony, "that he was going to the pawn shop and get a gun to finish the job that he hadn't . . . finished." The State's evidence to support the first element of Morris's attempt to murder his parents, *i. e.*, Morris's intent to commit the murder of his parents, is also sufficient to support the jury's verdict.

## 3. The second element of Morris's attempt to murder his parents

¶21. We begin our scrutiny of the State's evidence that Gregory Morris committed "a direct ineffective act . . . toward [the] commission [of murdering his parents]" -- the second element of the crime of attempted murder -- by reviewing the State's argument that its evidence was sufficient to establish that Morris had committed such "a direct ineffective act."

¶22. The "overt acts" with which the grand jury in its indictment charged Morris were: (1) sending each parent "a threatening letter," (2) "telling [each parent] that he was going to get a gun and kill [each one of them], and (3) "by obtaining a firearm."

¶23. In its brief, the State elaborates upon Morris's overt acts as follows:

> He [Morris] tracked his targets, traveled the substantial distance necessary to furnish himself direct access to [his parents], and procured the very weapon and abundant ammunition with which to accomplish his deadly mission. When his parents confronted [Morris] as to his purpose for being in Mississippi, the *essence* of his response spoke volumes as to his mission. 'I came to Mississippi to finish what I started in Michigan. I have purchased a weapon. Come go with me to get it, and I will kill you right there." This evidence clearly was legally sufficient for a rational fact finder to conclude beyond a reasonable doubt that defendant had done 'an overt act toward commission,' *i. e.*, that his acts had gone beyond mere operation or planning to the point where he had the power and means to accomplish his declared mission, but for the professional and timely intervention and prevention by the law enforcement authorities in Lowndes County.

¶24. Our supreme court as early as 1874 recognized the complexity of the legal question involved in the charge of attempting to commit a crime in *Cunningham v. State*, 49 Miss 685:

> This doctrine of attempt to commit a substantive crime is one of the most important, and at the same time most intricate, titles of the criminal law. It is truly remarked by Mr. Bishop, in his valuable work on criminal law, that there is no title, indeed, less understood by the courts, or more obscure in the text books, than that of attempts. There must be an attempt to commit a crime, and an act toward its consummation. So long as an act rests in bare intention, it is not punishable; but, immediately when an act is done, the law judges not only of the act done, but of the intent with which it was done; and if accompanied with an unlawful and malicious intent, though the act itself would otherwise have been innocent, the intent being criminal, the act becomes criminal and punishable. (49 Miss. at 701).

¶25. In one of the leading cases in the United States on attempt to commit a crime, a case from this State styled *Stokes v. State*, 92 Miss. 415, 46 So. 627 (1908), our supreme court stated:

> It is useless to undertake to reconcile the authorities on the subject of what constitutes an attempt, or what is an overt act, within the meaning of the section in question. It is equally impossible for us to undertake to lay down any rule on this subject which would serve as a guide in all future cases. To a very great extent each and every case must stand on its own facts. The text-books and decisions are noted for their lack of harmony. It is impossible to decide any case on this subject without doing violence to some author or some adjudicated case. Therefore all we can hope to do is to follow the best authorities and to clear up the subject as best we can, so far as the laws of this state are concerned. (92 Miss. at 424, 425, 46 So. at 628).

*Stokes* thereafter concluded:

When the intent to commit crime exists, or, to put it more accurately, when the only proof is that it is merely the declared intention of a person to commit a crime, with no act done in furtherance of the intent, however clearly may be proved this intention, it does not amount to an attempt, and it cannot be punished as such. But, whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt, and this court will not destroy the practical and commonsense administration of the law with subtleties as to what constitutes preparation and what an act done toward the commission of a crime. Too many subtle distinctions have been drawn along these lines for practical purposes. Too many loopholes have been made whereby parties are enabled to escape punishment for that which is known to be criminal in its worst sense. (92 Miss. at 427, 428, 46 So. at 629).

¶26. Morris strenuously argues that his actions amount to no more than the mere declared intention of a person to commit a crime, and that his conduct equals nothing more than preliminary preparation. We do not agree.

¶27. If we were to hold that further acts were needed in this case in order to constitute an attempt, e.g., loading the gun, placing it in his vehicle and/or actually setting out after his parents then we would be placing the victims, innocent bystanders and law enforcement in harm's way. The simple fact of the matter is that good and swift law enforcement thwarted a potentially violent situation.

¶28. We hold Morris's assignment of error to be without error.

**¶29. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT OF CONVICTION OF COUNTS I AND II ATTEMPTED MURDER AND SENTENCE OF SIX YEARS RESPECTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, SAID SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS ARE TAXED TO THE APPELLANT.**

**BRIDGES, DIAZ, IRVING, LEE, AND PAYNE, JJ., CONCUR. McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND SOUTHWICK, P.JJ., AND COLEMAN, J.**

McMILLIN, C.J., DISSENTING:

¶30. I respectfully dissent. Though there can be no doubt that Morris was engaged in nightmarish behavior, the clear effect being to intimidate and frighten his parents out of their wits, in my view he had not so clearly embarked on a committed course to purposely cause the death of his parents that a conviction for attempted murder may be permitted to stand.

¶31. None of Morris's bizarre actions can fairly be classed as "a direct ineffectual act" done toward the commission of the crime of murder. *Edwards v. State,* 500 So. 2d 967, 969 (Miss. 1986).

¶32. The letter Morris wrote to his parents, though evidently the product of a severely troubled personality, does not contain actual threats of murder. He vows to make his parents "wish you weren't so nasty to me," and to destroy his parents "like you done me." Clearly, whatever destruction Morris feels his parents might

have visited upon him in the past, he only promises to respond in kind. Since Morris remained alive, that threat of retribution could not be fairly read as a death threat, by any reasonable construction.

¶33. At no time during any of the face-to-face encounters between Morris and his parents did Morris do anything other than make threats. He apparently was not armed during any of these encounters. The only evidence on the point was Morris's own assertion that the weapon he had purchased remained at the pawn shop. The fact that, on the last actual encounter when the parents saw Morris in his car, he was observed to reach over into the his back seat of his vehicle does not prove an overt act toward murder. There is no evidence that would support an inference that, in doing so, he produced a firearm or that a firearm was even in the vehicle at that time. No further contact between Morris and his parents occurred prior to Morris's arrest at the Columbus motel. By that time, Morris's parents had left the community for their own safety. At the time of his arrest, Morris was inside the motel room and certainly not in a position to inflict imminent harm on his parents but for timely police intervention. The arresting officers discovered an unloaded rifle in the closet of Morris's motel room and a supply of ammunition, but there are simply too many uncertain events that would have to occur for the mere presence of an unloaded firearm in a motel room to constitute an overt act toward the murder of a person no longer physically present in the community.

¶34. On these facts, there is no *direct* act toward the commission of the crime of murder to support an attempt conviction. Even in their worst light, Morris's acts were too early in the preparatory stage to constitute an actual attempt. A threat to kill another person no matter how credible, combined with evidence that the threatening person possesses a firearm is not enough to sustain a conviction for attempted murder. Justice Oliver Wendell Holmes, Jr., in his classic work entitled *The Common Law* said:

> The law does not punish every act which is done with the intent to bring about a crime. If a man starts from Boston to Cambridge for the purpose of committing a murder when he gets there, but is stopped by the draw and goes home, he is no more punishable than if he had sat in his chair and resolved to shoot somebody, but on second thoughts had given up the notion. . . We have seen what amounts to an attempt to burn a haystack ["lighting a match with intent to set fire to a haystack has been held to amount to a criminal attempt to burn it, although the defendant blew out the match on seeing that he was watched."], but it was said in the same case, that, if the defendant had gone no further than to buy a box of matches for the purpose, he would not have been liable.

Oliver Wendell Holmes, Jr., The Common Law 68 (Sheldon M. Novik ed., Dover Publications, Inc. 1991) (1881). In a continuing discussion on the subject, Justice Holmes notes that "judges have been puzzled where to draw the line," but illustrates what, in his view, it takes to constitute a criminal attempt by observing as follows:

> When a man buys matches to fire a haystack, or starts on a journey meaning to murder at the end of it, there is still a considerable chance that he will change his mind before he comes to the point. But when he has struck the match, or cocked and aimed the pistol, there is very little chance that he will not persist to the end, and the danger becomes so great that the law steps in.

*Id.* at 68-69.

¶35. I do not seek to discount the apprehension and reasonable fears of Morris's parents for their own safety, and it may well be that Morris was guilty of crimes besides attempted murder for which he could

have been charged and punished. By way of example, I note that his original arrest was for the crime of stalking. I am, nevertheless, firmly convinced that Morris had not progressed so far into a scheme to cause the death of his parents that he may properly be convicted of attempted murder.

¶36. I would reverse and render.

**KING AND SOUTHWICK, P.JJ., AND COLEMAN, J., JOIN THIS SEPARATE WRITTEN OPINION.**

1. Section 97-1-7 provides:

Every person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, but shall fail therein, or shall be prevented from committing the same, on conviction thereof, shall, where no provision is made by law for the punishment of such offense, be punished as follows: If the offense attempted to be committed be capital, such offense shall be punished by imprisonment in the penitentiary not exceeding ten years; if the offense attempted be punishable by imprisonment in the penitentiary, or by fine and imprisonment in the county jail, then the attempt to commit such offense shall be punished for a period or for an amount not greater than is prescribed for the actual commission of the offense so attempted.

Miss. Code Ann. S 97-1-7 (Rev. 1994).